[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-12576

_____

D.C. Docket No. 1:19-cv-04214-LMM


NOEL N. CHUA, M.D.,

                                                            Plaintiff-Appellant,

versus

ANDREW J. EKONOMOU,
MICHAEL G. LAMBROS,
LAMBROS ATKINSON & EKONOMOU, P.C.,
THE LAMBROS FIRM, LLC,
STEVE BERRY,

                                                            Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 15, 2021)

Before WILLIAM PRYOR, Chief Judge, LUCK, Circuit Judge, and MARKS,[*] District Judge.

WILLIAM PRYOR, Chief Judge:

This appeal involves an alleged conspiracy by several state officials to violate a former physician's civil rights by pinning the blame for his patient's death on him. Noel Chua sued several of the alleged conspirators, including the court-appointed receiver in a civil-forfeiture action filed against him. The district court dismissed the claims involving actions taken within the scope of the receivership for lack of subject-matter jurisdiction because Chua did not obtain permission to sue from the state court that appointed the receiver. And it dismissed the remaining claims for failure to state a claim upon which relief could be granted. We conclude that the district court had jurisdiction to review the claims against the receiver for his acts taken within the scope of the receivership but that these claims fail because the receiver is entitled to judicial immunity. And we agree with the district court that the remaining claims fail as well. So we vacate in part and affirm in part.

## I. BACKGROUND

We accept as true, as we must at this stage, the following facts alleged in Noel Chua's complaint. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). In September 2005, a pre-med student at a local college began working in Chua's

_____

[*] Honorable Emily Coody Marks, Chief United States District Judge for the Middle District of Alabama, sitting by designation.

solo medical practice in St. Marys, Georgia. The student later moved into Chua's home. Chua started prescribing the student hydrocodone and increasingly stronger medications for headaches and abdominal pains. On December 15, he returned home to find the student lying on his bathroom floor, dead from an apparent drug overdose.

Chua alleges that a conspiracy was formed to pin the blame for the student's death on him. He calls it the "Making a Murderer Enterprise," and he alleges that its members included the district attorney and assistant district attorney for the Brunswick Judicial Circuit. The district attorney obtained an indictment against Chua for felony murder and violations of the Georgia Controlled Substances Act. He also initiated a civil-forfeiture action, allegedly to deprive Chua of the resources needed to mount a defense in the criminal trial.

According to Chua, the judge who presided over both his criminal and civil proceedings was also a member of the conspiracy. She issued a temporary restraining order freezing Chua's assets and appointed another member of the conspiracy, Michael Lambros, to serve as receiver in the forfeiture action. Andrew Ekonomou, who was a partner at Lambros's law firm, served as counsel to the receiver and also allegedly participated in the conspiracy. Between the beginning of the forfeiture action in 2006 and the termination of the receivership in 2015,

Lambros and Ekonomou depleted almost all of Chua's assets, worth about $2 million.

Chua alleges that, in the leadup to his criminal trial, the members of the conspiracy were worried about his friendship with Camden County Sheriff Bill Smith; they feared that Smith would "fix the jury" on Chua's behalf. Steve Berry, a private attorney and county commissioner, joined the conspiracy against Chua because he allegedly hated Smith. He wrote a memo to the district attorney's office cautioning that Smith had strong support in the local black community, which might pose a problem for jury selection: "Personally, I would avoid blacks on this jury. I understand you have some constitutional concerns that have to be kept in mind, but try and avoid them. [Sheriff] Bill [Smith] has lots of ties there and they would be the easiest for him to get to." During jury selection, the prosecutor allegedly followed this advice and struck five of the seven potential black jurors. Chua objected, but the judge accepted the prosecutor's proffered race-neutral reasons for the strikes.

At the conclusion of the criminal trial—which Chua alleges was marred by numerous irregularities—the jury found Chua guilty of felony murder and several counts of violating the Georgia Controlled Substances Act. The judge sentenced him to concurrent terms of life imprisonment for felony murder and five years for the controlled-substance convictions. She later denied Chua's motion for a new

trial. Chua appealed his convictions to the Georgia Supreme Court, which affirmed the felony-murder conviction and all but one of the controlled-substance convictions. *See Chua v. State*, 710 S.E.2d 540, 547, 549 (Ga. 2011).

In 2012, Chua petitioned a state court for a writ of habeas corpus based on alleged constitutional infirmities in his criminal trial. And in 2013, he allegedly discovered evidence of the memo about avoiding black jurors. The memo was undated and unsigned, but it provided a phone number matching Berry's office number.

Chua sued the district attorney under the Georgia Open Records Act to obtain formal disclosure of the memo. By that time, Ekonomou had joined the district attorney's office. In that role, he opposed the disclosure. He accused Chua's lawyer of planting the memo in the district attorney's files and argued that, regardless of its authenticity, the memo was exempt from disclosure as attorney work product. The judge agreed that the memo was exempt, but the Georgia Court of Appeals reversed and remanded for an evidentiary hearing.

At this point, Chua alleges, the conspiracy was on the brink of being exposed, so Ekonomou offered to settle the Open Records Act suit and all other pending litigation. Lambros, who by this time had been discharged as receiver in the forfeiture action, acted as a "go-between" for Chua and the district attorney's office. Under the proposed plea agreement, Chua's convictions would be vacated,

and he would plead guilty to involuntary manslaughter and one controlled-substance count and accept a sentence of time served. He would also dismiss his habeas petition with prejudice; never again practice medicine in Georgia; never "enter, reside[,] or be physically present" in any county in the Brunswick and Waycross judicial circuits; and have no contact with the victim's family or any witness from his criminal trial. Under a separate consent agreement, Chua would forfeit his claims to the assets seized by the State, except for about $14,000. Chua agreed to these terms and received his new convictions and sentence in September 2017, after which he was released from prison.

Two years after his release, Chua filed this action against Ekonomou; Lambros; The Lambros Firm, LLC; and Berry. He also listed "Lambros Atkinson & Ekonomou, P.C.," as a defendant, although he acknowledged in his complaint that this entity no longer exists. Chua alleged that the defendants conspired to deprive him of his civil rights, 42 U.S.C. § 1985; violated the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968; and violated the Georgia Racketeer Influenced and Corrupt Organizations Act, Ga. Code Ann. §§ 16-14-1 to -12. He demanded damages, attorney's fees, and other civil remedies. 18 U.S.C. § 1964; 42 U.S.C. §§ 1985, 1988; Ga. Code Ann. §§ 16-4-6, 51-12-5.1.

6

The district court dismissed Chua's complaint. It first addressed the claims against Lambros, Ekonomou, and the law firms for actions taken within the scope of the receivership. It determined that, under the *Barton* doctrine, Chua could not sue a receiver without first obtaining permission from the court that appointed the receiver. *See Barton v. Barbour*, 104 U.S. 126, 128 (1881). Because Chua did not have permission, the district court lacked subject-matter jurisdiction over those claims.

The district court then turned to the alleged misconduct that fell outside the scope of the receivership—specifically, that Ekonomou "overzealously litigat[ed] the Open Records action" while working in the district attorney's office and that Lambros "broker[ed] the deal that placed unenforceable conditions on [Chua's] release from prison." It determined that Ekonomou was entitled to qualified immunity but that Lambros was not because his court-appointed receivership had ended by the time he brokered the plea deal. But it concluded that Chua had failed to plead sufficient facts to state a plausible claim against Lambros. So it dismissed without prejudice the claims against Lambros for actions outside the scope of the receivership, and it allowed Chua to amend his complaint to address that allegation. It dismissed all other claims against Lambros, Ekonomou, and the law firms with prejudice.

7

Finally, the district court addressed the claims against Berry. It dismissed the section 1985 claim because Chua failed to allege that Berry was motivated to injure him by racial or class-based animus. And it dismissed the federal and state racketeering claims because Chua failed to allege that Berry had committed or aided any predicate acts.

Chua never amended his complaint to cure the deficiencies in his claims against Lambros. After the deadline to amend passed, the district court dismissed his remaining claims with prejudice.

## II. STANDARDS OF REVIEW

We review the dismissal of a complaint for failure to state a claim *de novo*. *Hill*, 321 F.3d at 1335. We accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Id.* We also review our jurisdiction *de novo*. *Chao Lin v. U.S. Att'y Gen.*, 677 F.3d 1043, 1045 (11th Cir. 2012).

## III. DISCUSSION

We divide our discussion in four parts. We begin with the claims involving actions taken within the scope of the receivership and conclude that, although the *Barton* doctrine does not apply, the defendants are entitled to judicial immunity. Next, we conclude that the district court correctly dismissed the claims under section 1985 because Chua failed to allege racial or class-based animus. We then

8

turn to the remaining claims and conclude that Chua failed to state a claim upon which relief can be granted. Finally, we conclude that Chua is not entitled to amend his complaint.

### A. Although the Barton *Doctrine Does Not Apply, Lambros, Ekonomou, and the Law Firms Are Entitled to Judicial Immunity.*

We must decide whether the *Barton* doctrine deprived the district court of subject-matter jurisdiction over Chua's claims against Lambros, Ekonomou, and the law firms for actions taken within the scope of the receivership, even though the receivership had already ended and Chua had forfeited his claim to his seized assets. The district court determined that the *Barton* doctrine applies even after a receivership ends, and it dismissed Chua's claims involving acts taken within the scope of the receivership. Chua contends that the district court should not have dismissed these claims.

In *Barton v. Barbour*, the Supreme Court recognized the "general rule that before suit is brought against a receiver[,] leave of the court by which he was appointed must be obtained." 104 U.S. at 128. After a train derailed from a defective track, an injured passenger brought an action for damages. *Id.* at 127. The railroad company was in receivership at the time, so the passenger sued the court-appointed receiver. *Id.* at 126–27. But the passenger did not first obtain permission to sue from the court that appointed the receiver. *Id.* at 127. The Supreme Court held that the failure to obtain permission was fatal to her claim: a court does not

9

have "jurisdiction, without leave of the court by which the receiver was appointed, to entertain a suit against him for a cause of action arising in the State in which he was appointed and in which the property in his possession is situated." *Id.* at 137. It reasoned that "[i]f the court below had entertained jurisdiction of this suit, . . . [i]t would have been an usurpation of the powers and duties which belonged exclusively to another court." *Id.* at 136.

We have discussed the *Barton* doctrine on only a few occasions. In our first published opinion on the issue, we extended the doctrine to bankruptcy proceedings. *Carter v. Rodgers*, 220 F.3d 1249, 1252 (11th Cir. 2000); *see Lawrence v. Goldberg*, 573 F.3d 1265, 1269 (11th Cir. 2009). We held that, as a matter of federal common law, "a debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity." *Carter*, 220 F.3d at 1252 (footnote omitted). Absent leave from the bankruptcy court, a district court lacks subject-matter jurisdiction over the debtor's cause of action. *Id.* at 1253. Although the original *Barton* opinion involved a receiver, not a bankruptcy trustee, we explained that applying the doctrine to bankruptcy proceedings was appropriate because "[t]he trustee in bankruptcy is a statutory successor to the equity receiver." *Id.* at 1252 (quoting *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998)). And even though the trustee had resigned by the

10

time the debtor initiated the action, we found that the outcome of the suit would have had an impact on the debtor's estate in the ongoing bankruptcy proceedings. *Id.* at 1251, 1253–54.

We recently held in *Tufts v. Hay* that "the *Barton* doctrine has no application when jurisdiction over a matter no longer exists in the bankruptcy court." 977 F.3d 1204, 1209 (11th Cir. 2020). Although "[w]e expressly note[d] that our holding . . . create[d] no categorical rule that the *Barton* doctrine can never apply once a bankruptcy case ends," we concluded that where any decision by a district court would have "no conceivable effect" on a bankruptcy estate, the *Barton* doctrine does not deprive the district court of subject-matter jurisdiction. *Id.* at 1209–10 (internal quotation marks omitted). We explained that "[o]ur holding flow[ed] from *Barton* itself: when the bankruptcy court lacks jurisdiction, there are no 'powers and duties which belong' to that court to be usurped by the district court 'entertaining jurisdiction of the suit.'" *Id.* at 1209 (alterations adopted) (quoting *Barton*, 104 U.S. at 136).

This limitation on the *Barton* doctrine is informed by a fundamental principle of *in rem* jurisdiction: the court that first exercises jurisdiction over certain property may exclude others from exercising jurisdiction over it. "[A] line of cases beginning with *Hagan v. Lucas*, [35 U.S. (10 Pet.) 400 (1836),] holds that the court, whether federal or state, which first takes possession of a *res* withdraws

11

the property from the reach of the other." *Toucey v. N.Y. Life Ins. Co.*, 314 U.S. 118, 134–35 (1941), *superseded by statute on other grounds as recognized in Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 524 (1986); *see also Wabash R.R. Co. v. Adelbert Coll. of W. Rsrv. Univ.*, 208 U.S. 38, 54 (1908) (citing *Hagan* and *Barton* in the same line of opinions addressing *in rem* jurisdiction). This rule of exclusive jurisdiction is one of "necessity" because multiple courts attempting to control the same property at the same time "would result in unseemly conflict." *Toucey*, 314 U.S. at 135 (internal quotation marks omitted). It follows that when there is no longer a *res* controlled by a single court, there is no longer a potential conflict in the exercise of jurisdiction over it. And the court that first exercised jurisdiction over the *res* may no longer exclude other courts from exercising jurisdiction. *See Porter v. Sabin*, 149 U.S. 473, 480 (1893) ("Until the administration of the estate has been completed and the receivership terminated, no court of the one government can by collateral suit assume to deal with rights of property or of action, constituting part of the estate within the exclusive jurisdiction and control of the courts of the other.").

A few of our sister circuits have concluded that the *Barton* doctrine applies even after a bankruptcy trusteeship has ended because it protects the court-appointed trustee from suit. *See Satterfield v. Malloy*, 700 F.3d 1231, 1236 (10th Cir. 2012); *Muratore v. Darr*, 375 F.3d 140, 147 (1st Cir. 2004); *Linton*, 136 F.3d

at 545; *see also In re Crown Vantage, Inc.*, 421 F.3d 963, 972 (9th Cir. 2005) (citing *Muratore* and *Linton* approvingly). The Seventh Circuit, for example, has explained that, unless the *Barton* doctrine extends past the conclusion of a bankruptcy proceeding, "trusteeship will become a more irksome duty" because the trustee will be forced "to defend against suits by litigants disappointed by his actions on the court's behalf." *Linton*, 136 F.3d at 545. It reasoned that bankruptcy courts will have a more difficult time "find[ing] competent people to appoint as trustees" and any appointees that they can find will "have to pay higher malpractice premiums." *Id.*

We disagree with our sister circuits that the need to protect court-appointed receivers and bankruptcy trustees is relevant to the *Barton* doctrine. Their opinions fail to grapple with the fact that the *Barton* doctrine is grounded in the exclusive nature of *in rem* jurisdiction. The need to attract qualified individuals to serve as receivers and bankruptcy trustees might be a legitimate policy concern, but it has nothing to do with subject-matter jurisdiction. Although our previous decisions discussing the *Barton* doctrine have credited this policy concern, they have done so only in dicta. *See Tufts*, 977 F.3d at 1210 n.4; *Lawrence*, 573 F.3d at 1269; *Carter*, 220 F.3d at 1252–53. This policy concern is unfounded because court-appointed receivers enjoy judicial immunity for acts taken within the scope of their authority. *Prop. Mgmt. & Invs., Inc. v. Lewis*, 752 F.2d 599, 602 (11th Cir. 1985). Receivers

13

do not need the *Barton* doctrine to provide an additional layer of protection for the performance of their duties.

The district court erred in concluding that the *Barton* doctrine applies even after the end of a receivership and that it lacked subject-matter jurisdiction over the claims against Lambros, Ekonomou, and the law firms for actions taken within the scope of the receivership. According to Chua's complaint, Lambros's appointment as receiver ended in 2015, and Chua later forfeited his claim to his seized assets in his consent agreement. Because there is no longer a disputed property over which the state court may exercise jurisdiction, there is no jurisdictional conflict between the state court that appointed Lambros and the district court where Chua brought this action. The *Barton* doctrine does not apply, and the district court had jurisdiction over these claims.

Notwithstanding that error, Chua's claims about actions taken within the scope of the receivership fail because Lambros, Ekonomou, and the law firms are entitled to judicial immunity. As a court-appointed receiver, Lambros receives "judicial immunity for acts within the scope of [his] authority." *Prop. Mgmt.*, 752 F.2d at 602. That immunity applies even if his acts were "in error, malicious, or . . . in excess of [the appointing court's] jurisdiction." *Bolin v. Story*, 225 F.3d 1234, 1239 (11th Cir. 2000). And it extends to his counsel as well. *Cf. In re DeLorean Motor Co.*, 991 F.2d 1236, 1241 (6th Cir. 1993) ("The protection . . . afford[ed] the

14

Trustee . . . would be meaningless if it could be avoided by simply suing the Trustee's attorneys."). Chua does not allege that Lambros acted outside the scope of his authority as receiver; to the contrary, he alleged in his complaint that Lambros acted "with the approval of the [c]ourt" that appointed him. So Lambros, Ekonomou, and the law firms are protected for their acts in performing the duties of the receiver.

### B. The District Court Correctly Dismissed the Section 1985 Claims for Failure to Allege Racial or Class-Based Animus.

Section 1985, passed by Congress as section 2 of the Civil Rights Act of 1871, Pub. L. No. 42-22, 17 Stat. 13, provides a cause of action for victims of conspiracies aimed at interfering with civil rights, 42 U.S.C. § 1985. As codified, it is divided into three subsections that address different types of conspiracies. *See Kush v. Rutledge*, 460 U.S. 719, 724 (1983). Chua did not specify in his complaint which subsections he intended to invoke, but the district court concluded, and Chua does not dispute, that only the second and third subsections apply to his allegations. Section 1985(2) provides a cause of action for victims of a conspiracy whose "purpose" is to "imped[e], hinder[], obstruct[], or defeat[], in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws." 42 U.S.C. § 1985(2). Section 1985(3) provides a cause of action for victims of a conspiracy whose "purpose" is to "depriv[e], either directly or indirectly, any person or class of persons of the equal protection of the

15

laws, or of equal privileges and immunities under the laws." *Id.* § 1985(3). A claim under either subsection requires the plaintiff to show that the conspiracy was motivated by "racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *see also Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1292 (11th Cir. 2002).

The district court found that Chua did not allege racial or class-based animus to support a claim under section 1985. Chua argues that the district court erred because he alleged that Berry and the other members of the conspiracy sought to keep black jurors off the jury panel. He contends that "an allegation of racial animus in jury selection meets the racial animus requirement" of section 1985.

The district court correctly dismissed Chua's claims under section 1985. Chua asserted in the complaint that the conspiracy against him "was formed to hold [him] accountable for the suicide" of the college student he was convicted of murdering. He never alleged that the "purpose" or "intent" of the conspiracy was to deprive him of the "equal protection of the laws" or of "equal privileges and immunities under the laws" based on his race or any other class-based reason. 42 U.S.C. § 1985(2)–(3). Even if, as Chua alleges, the conspirators tried to keep black jurors off the panel in the hope of increasing the chances of obtaining Chua's conviction, that allegation does not mean that the conspiracy was motivated by racial or otherwise class-based, invidiously discriminatory animus against Chua.

16

Insofar as Chua asserted a claim under section 1985 against Ekonomou for actions taken outside the scope of the receivership while serving in the district attorney's office, we conclude that Ekonomou is entitled to qualified immunity. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal quotation marks omitted). Because Chua failed to allege a violation of section 1985, Ekonomou is entitled to qualified immunity. Although we held in *Burrell v. Board of Trustees of Georgia Military College* that qualified immunity does not apply to a claim brought under section 1985(3), 970 F.2d 785, 794 (11th Cir. 1992), the Supreme Court recently abrogated that holding in *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1869 (2017) (holding that petitioners were entitled to qualified immunity with respect to claims brought under section 1985(3)).

## C. Chua's Remaining Allegations Fail to State a Claim Upon Which Relief Can Be Granted.

To the extent that Chua's claims against Ekonomou for "overzealously litigating the Open Records action" are predicated on the federal and state racketeering statutes, Chua failed to state a claim upon which relief can be granted. He asserts that Ekonomou violated several Georgia statutes while working in the district attorney's office. For example, he cites a statute providing that any attorney

17

"employed by the district attorney who is compensated in whole or in part by state funds shall not engage in the private practice of law." Ga. Code Ann. § 15-18-21(a). He also refers to a statute establishing penalties for any person who "knowingly and willfully fail[s] or refus[es] to provide access to [public] records" or who "knowingly and willfully frustrat[es] or attempt[s] to frustrate the access to records by intentionally making records difficult to obtain or review." *Id.* § 50-18-74(a). And he mentions a statute allowing a court to impose attorney's fees and expenses if "an attorney or party unnecessarily expanded the proceeding by . . . improper conduct." *Id.* § 9-15-14(b).

None of these alleged violations of Georgia law supports Chua's claim that Ekonomou violated the federal and state racketeering statutes by engaging in "a pattern of racketeering activity." 18 U.S.C. § 1962(c); Ga. Code Ann. § 16-14-4(b). A "pattern of racketeering activity" requires at least two acts of "racketeering activity" under both the federal and Georgia statutes. 18 U.S.C. § 1961(5); Ga. Code Ann. § 16-14-3(4)(A). Under the federal statute, racketeering activity is "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . , which is chargeable under State law and punishable by imprisonment for more than one year," as well as other violations of federal law. 18 U.S.C. § 1961(1). And under the Georgia statute, racketeering activity "means

18

to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime" from a list of predicate offenses, as well as any act defined under the federal racketeering statute. Ga. Code Ann. § 16-14-3(5). Chua does not allege that Ekonomou committed, attempted to commit, or induced anyone else to commit a predicate offense while litigating the Open Records Act suit. Nor does he allege that Ekonomou committed a crime punishable by imprisonment for more than one year.

Insofar as Chua's remaining claims against Berry and against Lambros for actions taken outside the scope of the receivership are predicated on the federal and state racketeering statutes, Chua has abandoned those claims. The district court dismissed the claims against Lambros involving actions taken outside the scope of the receivership for failure to state a claim. And it dismissed the racketeering claims against Berry because Chua did not allege that Berry had committed any predicate offenses under either the federal or state statutes. Chua does not challenge these decisions, so we will not address them. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).

### D. Chua Is Not Entitled to Amend his Complaint.

The district court allowed Chua to amend his claims against Lambros for actions taken outside the scope of the receivership, but it dismissed his remaining claims with prejudice. After not accepting the invitation to amend his claims

19

against Lambros, Chua concedes that the district court did not abuse its discretion by not granting him leave to amend the entire complaint. But he asks us to remand with instructions to grant him leave to amend so that he can add a new cause of action. He contends that a remand would be "in the interest of justice" because it would "finally[]" provide him "the opportunity to demonstrate the defendants' wrongdoing."

We decline Chua's request. He is not entitled to have "two bites at the apple." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 543 (11th Cir. 2002) (en banc) (internal quotation marks omitted). To allow otherwise would turn an appeal from a final judgment into an interlocutory appeal "because no matter what our ruling was, the district court would have to entertain further proceedings." *Id.* That system of appellate review would "add[] great trouble, time, and expense for defendants and the courts." *Id.* We will not further burden the district court or the defendants by giving Chua a do-over.

## IV. CONCLUSION

We **VACATE** the dismissal for lack of subject-matter jurisdiction of the claims against Lambros, Ekonomou, and the law firms for actions taken within the scope of the receivership, and we **REMAND** with instructions to dismiss these claims with prejudice based on judicial immunity. We **AFFIRM** the dismissal of the remaining claims.